Case 13-2498, Sandra Krause v. Brian Jones et al. Argument not to exceed 15 minutes per side. Mr. Flynn for the appellate. May it please the Sonoran Court. My name is Tim Flynn. I practice law in a law firm in Clarkston, Michigan and I've been detained by Ms. Sandra Krause in this matter. She is the mother of the decedent in this case. She's in your courtroom, Your Honors. Also, Tom Krause, the father of the decedent, is here. And I only mention that in passing just to set the context for this. I trust that the panel knows the facts of this unfortunate case. It's an excessive force under the Civil Rights laws, under Section 1983. This is a man who had caught a case, as we say, in the Wayne County area for drugs and weapons. This goes back to sometime in 2007, I think he was arrested, and that he was to appear for an arraignment in the circuit court in Detroit. He didn't want to go, and I am not going to stand here and argue what was in the decedent's perception and his mind on these things, only to say, by way of setting the context, this is a man who was, I believe, trying to bargain up the food chain in the drug industry. He had this mindset that he was dealing with the city of Livonia's police department, that he had taken care of this, this arraignment, but unfortunately not. U.S. Marshals showed up on an absconding recovery team, they found him, they turned this over to Redford's SWAT team, and then you know the rest of the story. This case does provide some interesting facts, and I think that that's what's driving this appeal. That's certainly what convinced Ms. Krause to appeal Judge Friedman's dismissal. Can I ask a clarifying question? Yes, Judge. So there are two different counts. There's one relating to the flashbang, and there's the other relating to the shots fired by the officers. So those are the two different things the officers did. Two seizures. What I don't see in the complaint, and I'm not sure I understand, period, is what's the injury from the flashbang. In other words, I can see saying, as to the death, maybe there's some unreasonable use of the flashbang that's somehow tied in, but I guess I'm not seeing… You know, sometimes flashbangs can injure people, sometimes it's not, but I'm not sure I understand what the theory of injury as to the flashbang is. Well, Judge Sutton, the argument from the officers, sister counsel is going to argue that qualified immunity attaches to these officers. This is something you would need to know. You're the one that writes the complaint. And I don't see any injury alleged in the complaint from the flashbangs. That's my point. It doesn't mean you don't have the obvious other injury, so I'm not… Well, there is a shooting seizure, but we are… I think that this circuit has cited a case. There are cases in this circuit that recognize that deployment of a flashbang does constitute a seizure. And there's been cases that date back to 2003, I think, is the first case that actually discusses whether or not deployment of a flashbang constitutes a seizure. I want to point to… I have cases which say that deployment of a flashbang in certain circumstances is both reasonable and unreasonable. That's right. But did the flashbang – are you alleging that the flashbang injured plaintiff's senior? Yes. We're alleging that that was an unreasonable, excessive use of force under these circumstances. In light of Bain, how is the use of a flashbang unreasonable in light of the fact that the plaintiff's senior was in there making threats, he was armed, and this standoff had persisted for a number of hours? I want to draw this panel's attention to a recent case in November from this court, Officer Jones v. County of Sandusky, Ohio. Is this one in your brief? This just happened, Judge, and to answer His Honor's question, very similar facts. You have a sleeping decedent armed with a shotgun. All I want to do is just make sure your friend on the other side and we have this case cited to us. Has it been cited to us yet? In our reply brief, yes. Okay. It's an unpolished decision. I draw the panel's attention to it because very similar facts. Did you see him sleeping with a shotgun across his lap? There was some recon. This court, the panel in the Officer Jones v. Sandusky case, remanded the matter to Toledo, the trial court, for two reasons. One, for further briefing on this question that you raised, Judge Sutton, on the deployment of the flashbang and whether that constitutes excessive force in those circumstances, which I'm going to suggest to you very similar to these. And secondly, Judge, that case is going to trial in September on the shooting. Okay. Well, wait a minute. Before you go any further and rely on Jones, that case would be factually indistinguishable because there is no evidence of the record that the plaintiff's decedent in this case was asleep. That was one of your theories. It was never proven, was it? Well, Judge, this case, as you know, was subject to a dispositive motion, so what the record consists of at the briefing stage below is deposition testimony. The officers deployed two devices, a camera ball that they rolled into this room in this closet, and they also used a pole camera. And their information was he was sleeping, so that, I'm going to argue, is part of the case in this. It seems like we're getting up. We got a little bit of emergency. We can work it out. Actually, I think, Judge Barbee, you may have hit the button on the left side. Oh, yeah. And so, you know, with these questions, what I would like to do then is I want to focus briefly then, because my time is ticking away. I want to focus just briefly on the shooting. You know, in the Officer Jones v. Sandusky case, that shooting, there were – the officers were testifying that he was moving his shotgun barrel around right before the shot. There was a lot of smoke coming off of this flashbang grenade. And we have something similar in here. Don't – isn't it not disputed that the decedent fired the shot? No, we dispute that, Judge. What's the factual evidence that contradicts the evidence that the decedent fired the shot from the gun he was holding? The evidence below is that we made an offer of proof. The decedent had no gunpowder residue on his hands. We had an expert witness. When you say expert, what are you referring to? We had a witness list filed, and an expert witness was prepared to testify to that. When you say expert, are you referring to the coroner? The coroner. What's the name of the coroner? Spitz. That's Spitz. Okay, there was a coroner that was prepared to state that. There was a witness – I don't recall the name. There was a reconstructionist saying that the shot that they did find in a wall could not have come from this man's death position. That it could not come from his gun. There was some testimony in an MSP. When – what's this evidence? I mean, you keep calling it an expert, but it's a coroner, right? Isn't it better to just say the coroner reported it? Well, it was a hired expert witness, this coroner, from Macomb County. It wasn't the coroner from – okay, so fine. When did this person look at the deceased's file? At some point subsequent to death, they were allowed to examine this witness. I don't want some point subsequent to death.  I don't know, Judge. Okay, well, that's – you can say there's an offer of proof that the district court erred if you're not going to specify exactly when it was. Because it's not very useful to say several days later they didn't find any gunpowder residue on somebody, but several days later. That's really critical. You know, Judge, unfortunately I didn't work up this case. Okay? It was an offer of proof. There's that. There is testimony, deposition testimony from Officer Jones where he says he saw a flash from a muzzle. But the other officers, Gilman and the third officer that came into the room, were equivocal about whether they heard a first shot. So we would dispute that there was a shot fired. There's also a theory – Now, Jones was on the floor inspecting himself. He's looking for whether or not there's any blood because he heard the shot. Did he not? He says that he saw a muzzle flash. That's his testimony. Okay. The other two officers equivocate on that fact as to whether they heard any shot. He's the first guy in the room, I think, if I'm correct. He's the first guy in the room. Jones. Right. Yes. He's disoriented along with the other officers that trailed in because of the flashback. And, you know, what I wanted to make a point – What's the theory of how there was a bullet hole? I mean, what's the theory? The police officer went and grabbed a gun and shot him? No, that's not a theory, Judge. Okay, so what is the theory? The theory is that we don't know. It could have been shot. We don't know anything about that bullet hole. But what we don't know doesn't help us at summary judgment, right? I mean, the other side gets to put on what they think are the facts. That's because the material ones, you have to dispute them. Let's set aside – So it's clear a shot was fired. There is some evidence of that, Judge. But let's look at it this way from a police tactic standpoint. You've got a sleeping individual. Those facts are in the record. Deposition testimony, recount from the police from Redford. He's sleeping. This flashbang device is the subject of many cases that are now percolating up in this circuit, the Seventh Circuit. And what I want to tell you, Judge Sutton, is that logically, from a law enforcement perspective, you're going to disorient and stun a sleeping individual with your weapon set to automatic. You're going to come in there, wake him up, and through this device that causes high decibel, a flash of light. That seems inconsistent. And what I want to suggest is that it was unreasonable. Probably shouldn't have done it this way. Wouldn't you have put the trigger on automatic if you were going to? What I think I would have done were I trained a police officer. Let's say no flashbang. They don't use it. Let's say they're right about that. You know the person's armed. You know they've said things that suggest they're ready to die. They don't mind a shootout. That seems to be what he's saying. Maybe the officers couldn't handle this perfectly. But once they make the decision, you would not have put the trigger on automatic. I think if I was an officer, with all due respect, Judge, I think I would have waited it out like they should have done. That's not my question. Once you decide to go in, wouldn't you have put it on automatic? It's an option. I could have put it on semi-automatic. I could have put it on automatic. If I'm going to deploy a flashbang and I'm going to have my weapon on automatic, it's guaranteed to escalate to lethal force. Pretty much guaranteed. I think that's what they want. If he's shooting at us and we're pulling the trigger, we want this ending very quickly. I have no doubt that's what they want. But what I think this panel should look at, though, is that when this suspect is asleep, they need to wait this out. They had a second negotiator. There's evidence of that. He was coming onto the scene. There's cases that say, you know what, most of these barricaded gunman situations resolve through waiting it out. There was no downside to doing that. Now, I'm just suggesting to you that the Jones v. Sandusky case is so similar that that case got a breath of fresh air on remand. The issue of the flashbang has been remanded for additional briefing. The judge in Toledo is to issue an opinion apparently any day now. I guess it's past due. And then as I say, the shooting seizure portion of the case, that segment is going to trial in September. And that's had to do with various different fact patterns based on what the officers say the gun position was. A panel at this court found that there was genuine issues of material fact as to the shooting seizure. I think you've got that here. I also think that if this court takes a look at the analysis in Jones, and I see that as my time is winding down, I just want to think the time's up. But you can keep going and just use your rebuttal here. It's fine. If I may, I will yield to a sister counsel with leaving this panel with sort of the conclusion of this Sixth Circuit Court's Jones panel. Read in conjunction with testimony that gunfire occurred immediately after the detonation of the flashbang device. The fact that the police had not made prior contact with Jones. Conceitedly, that's different than what we have here. And the evidence that Jones was asleep prior to the detonation of the flashbang device, this evidence creates a genuine issue of material fact as to what threat the police perceived before they fired at the scene. And more importantly, whether that threat was reasonable. That's this case, Your Honors. Okay, thank you. We'll hear from Ms. Staley. Good morning, Your Honors. Karen Bailey on behalf of the Defendant Office of Service and the Township of Bradford. Briefly, I just want to address the Jones case first. Frankly, I think that was wrongly decided under their facts. But more importantly, to our case, it's clearly distinguishable. In that case, from the time that the police made contact or arrived at the scene to the time the flashbang went off, it was an hour and a half. It's clearly different than the 10 hours here. They also had no contact with the suspect there. And in that case, the suspect, although he was armed, he did not threaten to kill any law enforcement officer that came into the house. So those facts are distinguishable. Do you dispute that the decedent in this case was asleep? They don't know. They said it from the – they had a couple cameras in there. They said it appeared that he was asleep. But they couldn't confirm that he was asleep. So why are you backing off of that? Doesn't that help? That makes you look more reasonable. You waited until he was sleeping. Well, and that's why they decided to go in when they did. But my point is that this goes to the use of the flashbang and the setting it on automatic weapons. They didn't know for sure. They assumed he was sleeping. What would have been the harm in waiting it out? Was anyone threatened other than the deceit? And let's say the deceit was threatening to kill himself, but no one else was being threatened. You waited, I mean, 10 and a half hours. Why not wait two more? Why not wait 10 more? Well, first of all, that's – even if that was – should have been the appropriate decision, that's not a Fourth Amendment violation. If anything, that would have been negligence. But more importantly, why wait it out? He was threatening to kill himself. They were trying to prevent that. So they should kill him instead? Well – No, no. Let us kill him. They didn't go in there with the idea that it was going to end in a death. Wait a minute. They went in there with their weapons set on automatic, after a flashbang, with three armed officers, and they didn't intend to kill him? No, because the only reason – the only reason that they fired was because he fired first. If there wasn't that first shot, those – How many bullets were found in this deceased's body? I don't know. I believe it was 19. Right, because it was set on automatic. It was over 20. So you don't think that represents an intent to kill? You think you can main with .1? Sure. Do I think once they shot, they intended to kill him? Absolutely. Okay. Once he shot. But that's the evidence we have here. He shot at the officers. Now, whether it was voluntary or involuntary, I know Brother Counsel has argued in his briefs that it was involuntary. It was caused by the flashbang. That doesn't matter. The reasonableness is looked at from the perspective of the officer. What did he know when he was going in? He knew that the victim or the suspect had multiple weapons. He had threatened to kill any law enforcement officer that came into the room. Multiple weapons. So what does that mean? A handgun? He had a handgun. They said that there was an AK-47, so they knew he had an automatic weapon. And ultimately what was recovered was a revolver, a hunting rifle, an assault rifle, and a shotgun. Wasn't there evidence actually that they thought he had an automatic weapon? They weren't certain. The U.S. Marshals said that he confirmed that he had an AK-47 in the room. Was that confirmed before they went in or they found it out after they went in? No, the U.S. Marshals. Just tell us the witness. Which witness said that? It's in the U.S. Marshals report. They didn't take depositions of the U.S. Marshals. Okay. The U.S. Marshals report says this was disclosed before they went in. Yes, it was disclosed by the suspect that there were multiple weapons, including an automatic weapon. Now, I don't know if it was seen by them or if he specifically said, but in the report it says that the Marshals or that the suspect confirmed he had multiple weapons and that he was ready to die. So I'm just looking at Jones. Is there a shot by the decedent in Jones? I can't figure that out. No. You mean in the case? Yeah. The Jones case? Yes, the decedent in Jones. I'm sorry. I just understood. Does the decedent in Jones fire a shot before the police shoot? In the Jones case, no. I see. No, there was no shot fired. Do you have any case law on this question of why not wait it out? I mean, I can imagine courts saying things like Judge Martin said that, you know, now that we look back on it, this person is basically suggesting death by police officer, so why not wait until he gets hungry or decides, you know, I'm feeling a little better now, I'm not going to hurt anybody. Well, again, you don't look at it in hindsight. You look at what they were faced with at that moment. There's no rib. It was a tactical decision that was made by the officers. I'm not hearing the question. You should hear the question and then see if you can answer it. The question is, what's the risk in waiting? I mean, it's funny to say you are preventing him from suicide if you wait ten hours. That theory makes some sense if you go in fairly quickly, but after ten hours, it's a little odd to say you are preventing him from killing himself. That's an awful lot of patience. I'm asking for cases that can help you or hurt you. I don't care. I just want to know are there cases that say delay is not part of the evasion, that's just strategy. I don't have a specific case as far as delay. If you'd like, I can research the issue and file a supplement. Graham v. Conner, though, says that those are tactical decisions, that whether or not, I believe Bing even discusses it, whether or not they choose to go in with a shield, whether they choose to set their weapons on automatic or semi-automatic. My question is whether to go in. That's the thing I'm interested in. Right. It's a tactical decision. They thought he was sleeping, so they went in. They thought if this was ever going to end, they made the tactical decision that they should go in when they did. They felt that that was the safest way. This guy threatened to kill any law enforcement officer he saw. Who's to say he couldn't come out shooting at everyone? He was fully armed. So one way of making your strategy point on delay is to say, well, they did delay. Yes, it's true. They didn't wait until he said, you know, I'm feeling better now. I've come off of whatever my problem was.  I put my gun out the window. That could have happened. They could have waited for that. But the thing they could have also waited for was until he was sleeping, which is what they didn't do. Correct. And the question is whether that's reasonable or not. Sure. You know, the thing is he had refused to surrender. There were ten hours that he refused to surrender. That plays into their decision. It didn't look like there was any chance. In fact, there were multiple times he said, okay, okay, I'll come out. And then he said, no, I'm not coming out. So there was no indication that he was willing to surrender at all. And there are cases that discuss that. Excuse me? Was a negotiator, like a police negotiator? Yes, there were negotiators there. And they were talking to him? Sure. And was there ever any consideration given to the fact that this man may be somewhat deranged? Well, I believe there was discussions that he was on medication. Okay. Would it have been unreasonable to deal with him as a deranged person? Would a reasonable officer at the scene have dealt with a deranged person the same way as he or she would have dealt with someone who was not deranged? Deranged or not, when you're armed with four guns and threatening to kill officers, they would have dealt with him the exact same way. I mean, to me, this is— If you're deranged and you have guns, you should be killed. If you're shooting at officers, absolutely. Or you're threatening officers because they made a decision to go in. They didn't shoot at him until he shot at them first. There is no question that there was a shot. Is that uncomproverted? I'm sorry? Is that uncomproverted? It is uncomproverted that there was a shot. Yes. By the first— Yes. There is testimony from Gilman. Jones saw it come out of the handgun that Krause was holding. The other two officers were equivocal on that, at least according to Brother Cowan. That they heard a shot first before— There's other witnesses outside that said they heard one or two shots and then multiple shots. Was Jones the first officer to return fire after he was shot at? He was the only officer to return fire. Okay, so it's conceivable in this mayhem that Jones' gun was the shot that Officer Gilman and Butler heard. Isn't that possible? I don't think it's possible. Not when it's not an automatic. You're not going to have one shot. No, that would— That would never happen. What's the first shot? I mean, the shot came to rapid fire. No, they heard one or two shots, and then the rapid shots were— And that is uncontroverted. What do you say about the expert coroner? First of all, there is no expert coroner. There's no expert report. There's no expert testimony. The point I think he's making is that they tried to submit something, and the district court wouldn't consider it. Well, that's just not true. Okay, well, just tell us what happened. I'm just trying to figure it out. Well, the only coroner report that they have that they rely on for the lack of gunshot residue is Dr. Spitz. He did the autopsy after the first autopsy was performed. He was already in his funeral clothes. He had already been embalmed when this autopsy was done. So if there's no gunshot—and he does say in his report that there's no muzzle, you know, there's no gunshot marks anywhere on his body. I don't know that he specifically says about his hands, but it was after he was embalmed. He had the funeral makeup on, the funeral clothing on, and it was the second autopsy. And they have no testimony, no evidence whatsoever from the coroner that says that it couldn't have happened the way that Jones said. That's just one of the theories. They never presented any evidence to that effect. So unless the court has any other questions, I'll rely on my brief for the other arguments. Okay, thank you, Ms. Taylor. Mr. Flynn, did you vote? Thank you, Your Honor. Just very briefly— If I could ask you one thing, why is there a significant distinction with Jones? There, there's no evidence of a fired shot by the decedent. The equivocating evidence there in Jones is that the officers observed the decedent moving the shotgun barrel around differently due to the smoke and the flashback. And that was enough for a panel in this court to send it back. Okay, but maybe we're not— As to the shooting. As to the shooting. There were questions of fact. Right. It wasn't a shot. You're right, Your Honor. There was no shot, but it was moving the shotgun barrel. Okay, just very quickly, to me it's a really, really big deal. Tell me a case, because to me it just doesn't add up to common sense. If someone shoots a police officer and lethal force is used by the police officer's response, my sense of the world is that's incurred risk. Yes. And, sorry, but that's the way it works. Now, tell me a case that says, no, it's not that simple, because I think it is that simple. Jones is—makes it— But Jones— What about Plonhoff? What about Plonhoff? You know, Plonhoff pretty much put this matter to bed. If you can't controvert that the decedent shot first, and I agree with Judge Sutton, once the decedent shoots at the police, they're going to use— —the force necessary to do away with the threat. All I can say— That's how they eliminated the threat. And that's what Plonhoff says. Yes, as to the shooting, you know, I didn't develop the case below, and who knows, it might not be the strongest of cases, but there is some evidence that there wasn't a shot, and we can test the shot. Okay. If Plonhoff doesn't have a shot. I just want to clarify, that really is your argument. Because once you can see—if we find it, once you decide that the evidence all goes one way and that there was a shot fired, I'm just really struggling with what's left. Judge Sutton— But I'm just saying that still leaves you with the real point. The real point is there was no shot. Here's the real point, though, and I have no time left, but I'll make this point if it pleases this court. The real point is the Belitz v. Gribble case. It's a case that sister counsel was on. That's the main legal point, and that says when the man is sleeping, the officers don't get to decide that his time is up. Was a shot fired in that case? No. That case, it was the barking dog case, and the man—I don't believe there was a weapon. I think that the man involved in the house that was being searched came out onto the police. I don't think it's factually disordered. What that case says, though, Judge, is it says that it's well-established that a citizen has the right to be free of deadly force when he's not posing an immediate threat. When the man is buried in the closet asleep, he's not posing an immediate threat. How about this? That's a well-established right. I don't think he probably went, if that's true. In sleeping? In sleeping. And he shot, and I think there's a tribalistic effect there, if not summary judgment for you. So the deployment of the flashbang is an issue there. This is why the flashbang—this is your point about the flashbang. That's right. We have to step back from the—when Officer Jones sees the muzzle flash, okay, that's not a strong case for the deceit. That's not great. But I think— But you've got to step back and try that. But I think it's still struggling to know what is the injury from the flashbang. I still don't think we have an answer. It caused the confusion among the officers. They come rushing in with guns set to automatic, and execution— It's a challenge to the approach that was taken. That's it. A challenge to the tactics. We're saying that tactics are not— They didn't deploy a flashbang in the first place. That's right. But that's contrary to being, because there were two flashbangs at best. The one that set off the accelerants was improper. But the other one was not. So how can you distinguish this case from Bing? Because what you're telling us is that it was unreasonable for the officers to deploy the flashbang in the first place. Yes. Why was it unreasonable when there were no accelerants, there was nothing that would cause this case to blow by using the flashbang? Well, Your Honor, two quick points. You're right. Bing is unusual. This court did say in Bing that that second flashbang that burned down the man's house was excessive. But they basically said it's not—the use of a flashbang is not a clearly established right to be free from that deployment, apparently. It was odd. But also I noted about Bing—this goes to our second seizure, the shooting—that case went to trial on the shooting. That case got— Let me put it to you this way. Bing got shot dead. If you can't ask—if you can't distinguish Bing, I don't know that that helps your case considerably because I think that it's correct that once he shoots, that's it. Once he shoots, it's over. But if your position is it was unreasonable to deploy the flashbang in the first place, you better be able to distinguish Bing and our decision that it was reasonable to use a flashbang in the first instance. I can do it, Your Honor. All right. In Bing, the man, the whole police force, the SWAT team there, they all were on the same page that there was a shot came out that man's window before the flashbang got deployed. And they said, guess what, Mr. Bing, time's up. We're coming in. That's a huge difference. In our case, the alleged shot, which we contest, happened right at or after the deployment of this flashbang. So that's a huge difference. And if you look at Bing, the other distinction is that those officers in their deposition said, we would have waited all night for the man to come out. We would have waited all night. That's in Bing. Mr. Krause did not give that deference. So I totally get this idea. I really do wonder why they just don't wait until someone changes their mind and comes down off whatever the problem is. But just stick with me for a second. I'm going to touch on it. Why would it be a reasonable theory to say we're going to wait? I mean, Tal, this is a long time until he falls asleep. And that's what they did. They knew he'd fall asleep eventually. He does. And, I mean, so I don't know. In terms of the – forget everything else about the case because I think there's a lot to this idea. Why are you escalating the situation? But why wait until someone falls asleep seems like a pretty good strategy. Well, you know, perhaps so. But when he's asleep, to utilize and deploy a device that's designed to stun and disorient seems inconsistent as a tactic to me. And I'm just saying that tactic is relevant and a jury should assess whether, you know, it was appropriate. Okay. All right. I get the point. I think everybody have any other questions? Your Honor. All right. Thank you, Mr. Kline. Thank you, Mr. Ailey for your helpful briefs, oral arguments. We appreciate it. The case will be submitted and the court will call the next case.